Behram V. Parekh, State Bar #180361
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444
bparekh@wisnerbaum.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GREGARY JOHNSON, SHARI SALER, MIKE DELAGRANGE, ROBERT WHITE, and LISA BARTLETT,<br><br>*Plaintiffs*,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>*Defendant*. | Case No. 2:26-cv-12159<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs GREGARY JOHNSON, SHARI SALER, MIKE DELAGRANGE, ROBERT WHITE, and LISA BARTLETT (collectively "Plaintiff" or "Plaintiffs") by and through undersigned counsel, and for their Complaint against Defendant ABBOTT LABORATORIES seeking damages (the "Action"), allege as follows:

## INTRODUCTION

1. This is a product liability action involving injuries sustained by Plaintiffs following the implantation and failure of a spinal cord stimulator (SCS) system designed, manufactured, and marketed by Defendant Abbott Laboratories ("Abbott"). The devices were implanted in Plaintiffs' bodies as a purported treatment for chronic pain, but they failed to perform as promised and instead caused serious harm.

2. The SCS device at issue received Food and Drug Administration ("FDA") approval in 2001 under PMA P010032, originally granted to Advanced Neuromodulation Systems, later acquired by St. Jude Medical. Since that time, however, the device has been fundamentally altered through hundreds of PMA supplements, modifying its battery chemistry, firmware, waveform control, leads, and user interface, without the benefit of a new PMA or any renewed clinical safety validation. As alleged in detail below, a number of these changes were significant enough that they met the regulatory criteria for a panel-track supplement supported by new clinical data, see 21 U.S.C. § 379i(4)(B); 21 C.F.R. § 814.39(a), yet Abbott processed them instead as lesser-tier supplements reserved for minor changes, thereby avoiding the clinical revalidation those changes required.

3. These cumulative changes, approved outside public view, transformed the device's mechanism of action, performance characteristics, and risk profile. Abbott failed to disclose these material changes to patients, physicians, or regulators. As a result, Plaintiffs were implanted with a device that was materially different from what had been tested and originally approved by the FDA. Plaintiffs

suffered painful neurologic symptoms, worsening pain symptoms, and potentially permanent injuries.

4. Plaintiffs bring this Action under California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky law, asserting both traditional product liability and statutory claims. These claims are based in part on Abbott's failure to satisfy the requirements that federal law itself imposes on PMA and PMA-supplement holders, and/or on independently existing duties under applicable state common and statutory law; Plaintiffs do not seek to impose any requirement on Abbott that is different from, or in addition to, the requirements imposed by the FDCA and its implementing regulations. Plaintiffs seek compensatory damages for Plaintiffs' injuries.

## PARTIES

### I. PLAINTIFFS

5. **Plaintiff Gregary Johnson** is a resident and citizen of the State of California. At the time this Complaint is filed, Plaintiff Johnson resides in Kings County, California. The devices at issue were implanted in Plaintiff Johnson in California. At the time of his implant, Plaintiff Johnson resided in San Luis Obispo County, California, a county in this District. On or about March 31, 2025, Plaintiff Johnson moved to Santa Maria, Santa Barbara County, California, also a county in this District, before later relocating to Kings County. Plaintiff Johnson has received medical treatment related to the device in California. Plaintiff Johnson had his Abbott SCS permanent device implanted on or about June 13, 2018.

6. **Plaintiff Shari Saler** is a resident and citizen of the State of Pennsylvania. At the time this Complaint is filed, Plaintiff Saler resides in Somerset County, Pennsylvania. The devices at issue were implanted in Plaintiff Saler in Pennsylvania. Plaintiff Saler has received medical treatment related to the device in Pennsylvania. Plaintiff Saler had her Abbott SCS permanent devices implanted on

or about October 18, 2024, and January 20, 2025.

7. **Plaintiff Mike Delagrange** is a resident and citizen of the State of Georgia. At the time this Complaint is filed, Plaintiff Delagrange resides in Jackson County, Georgia. The devices at issue were implanted in Plaintiff Delagrange in Georgia. Plaintiff Delagrange has received medical treatment related to the device in Georgia. Plaintiff Delagrange had his Abbott SCS permanent device implanted on or about September 27, 2023.

8. **Plaintiff Robert White** is a resident and citizen of the State of Alabama. At the time this Complaint is filed, Plaintiff White resides in Randolph County, Alabama. The devices at issue were implanted in Plaintiff White in Alabama. Plaintiff White has received medical treatment related to the device in Alabama. Plaintiff White had his Abbott SCS permanent device implanted on or about November 1, 2024.

9. **Plaintiff Lisa Bartlett** is a resident and citizen of the State of Kentucky. At the time this Complaint is filed, Plaintiff Bartlett resides in Meade County, Kentucky. The devices at issue were implanted in Plaintiff Bartlett in Kentucky. Plaintiff Bartlett has received medical treatment related to the device in Kentucky. Plaintiff Bartlett had her Abbott SCS permanent device implanted on or about October 22, 2024.

## II. DEFENDANT

10. **Defendant Abbott Laboratories** is a corporation organized under the laws of the State of Illinois with its principal place of business located in Abbott Park, Lake County, Illinois. Abbott Laboratories is a global healthcare corporation engaged in the design, manufacture, promotion, and sale of medical devices, including spinal cord stimulation systems, throughout the United States, including in California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky. Abbott Laboratories assumed ownership of the SCS device portfolio at issue following its

acquisition of St. Jude Medical in 2017.

## JURISDICTION AND VENUE

11. *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states – specifically, Plaintiffs are domiciled in California, Pennsylvania, Georgia, Alabama, and Kentucky, whereas Defendant is an Illinois corporation with its principal place of business located in Illinois.

12. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant Abbott Laboratories because it conducts substantial business within this District, and has purposefully availed itself of the privileges of conducting activities within the State of California by maintaining sales representatives in the State, marketing its devices in the State, and causing injuries in the State as a result of the implantation of its devices. This court also has pendent personal jurisdiction over the non-California Plaintiffs' claims as they share a common nucleus of operative facts with the California Plaintiff's claims. Plaintiffs Johnson and Delagrange were each implanted with the same Abbott Proclaim implantable pulse generator, Model 3660, and each Plaintiff's device could not be placed into MRI mode, preventing each Plaintiff from obtaining a medically necessary MRI; each Plaintiff's device was programmed and reprogrammed by Abbott sales representatives under the same Abbott practice of representative-performed programming in response to patient complaints; and in each case Abbott's representatives attributed the device's failure to causes specific to the individual patient and responded by reprogramming the device rather than disclosing known failure modes of Abbott's devices.

13. *Venue.* Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred here, including the implantation of the device in Plaintiff Johnson,

the programming and reprogramming of Plaintiff Johnson's device by Abbott's sales representatives in this District, and representations made by Abbott's sales representatives to Plaintiff Johnson in this District. Venue is also proper under the pendent venue doctrine as all Plaintiffs' claims are so unquestionably related to each other that they form part of the same case or controversy. The claims asserted by all plaintiffs undoubtedly show a common nucleus of operative fact, involve common issues of proof, and the existence of many of the same witnesses.

## FACTUAL ALLEGATIONS

## III. APPLICABLE LAW AND CHOICE OF LAW

14. This Action arises under both federal and state law. Plaintiffs bring state-law claims against Abbott Laboratories for personal injuries sustained as a result of its defective spinal cord stimulator system, which, as to Plaintiff Johnson, was marketed, implanted and programmed from within this District.

15. **Plaintiff Johnson** was implanted with the subject device in the State of California, resides in California, and experienced the injuries giving rise to this lawsuit in California.

16. **Plaintiff Saler** was implanted with the subject device in the State of Pennsylvania, resides in Pennsylvania, and experienced the injuries giving rise to this lawsuit in Pennsylvania.

17. **Plaintiff Delagrange** was implanted with the subject device in the State of Georgia, resides in Georgia, and experienced the injuries giving rise to this lawsuit in Georgia.

18. **Plaintiff White** was implanted with the subject device in the State of Alabama, resides in Alabama, and experienced the injuries giving rise to this lawsuit in Alabama.

19. **Plaintiff Bartlett** was implanted with the subject device in the State of Kentucky, resides in Kentucky, and experienced the injuries giving rise to this

lawsuit in Kentucky.

20. However, significant aspects of the design, manufacture, regulatory strategy, and labeling of the device occurred within the State of Illinois. Defendant Abbott Laboratories is headquartered in Lake County, Illinois, and its spinal cord stimulator operations, including FDA submissions, marketing approvals, and product development, were directed from that location at all relevant times.

21. Under Illinois choice of law principles, courts apply the "most significant relationship" test as set forth in the Restatement (Second) of Conflict of Laws, considering factors such as the place of injury, the place of conduct, the domicile of the parties, and the location where the relationship is centered. See *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 903 (Ill. 2007).

22. California, Pennsylvania, Georgia, Alabama, and Kentucky law governs Plaintiffs' personal injury claim respectively, however, to the extent this action concerns Abbott's regulatory decisions, FDA submissions, and corporate conduct occurring in Illinois, Plaintiffs invoke Illinois law in the alternative for claims that arise from Defendant's forum-based behavior.

## IV. <u>REGULATORY BACKGROUND AND PMA HISTORY</u>

23. The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., requires that all Class III medical devices undergo pre-market approval ("PMA") by the United States Food and Drug Administration ("FDA") before they may be introduced into interstate commerce. The PMA process is the most rigorous pathway under the FDCA and is intended to ensure the safety and effectiveness of devices that support or sustain human life, prevent impairment of human health, or present a potential unreasonable risk of illness or injury.

24. Once a PMA is approved, 21 C.F.R. § 814.39(a) requires that any change to the design, materials, energy source, software, manufacturing process, or labeling of the device that could significantly affect its safety or effectiveness be

submitted as a PMA supplement, with the type of supplement – panel-track, 180-day, real-time, or 30-day notice – dictated by the nature and significance of the change and the clinical or preclinical data needed to support it. See 21 U.S.C. § 379i(4)(B)-(D); 21 C.F.R. § 814.39(a), (c). A change of the kind that requires new clinical data to provide reasonable assurance of safety and effectiveness must be submitted as panel-track supplement; a manufacturer may not use an expedited track reserved for minor changes to avoid that clinical data requirement.

25. The spinal cord stimulator (SCS) system implanted in Plaintiffs were marketed under PMA P010032, originally approved in 2001 for a basic neurostimulator system manufactured by Advanced Neuromodulation Systems, Inc. This predicate device consisted of an implantable pulse generator (IPG), fixed stimulation output parameters, a wired programming system, and a battery designed for limited-term use. This predicate system was called the Genesis Neurostimulation (IPG) System.

26. Since that time, Abbott and its predecessors submitted more than 230 PMA supplements, fundamentally transforming the device's internal firmware, waveform architecture, patient interface, battery design, wireless communication, and safety-critical stimulation parameters. Despite these cumulative changes, no new PMA has ever been required or submitted, nor has Abbott conducted and submitted additional safety and efficacy studies. As set forth in Paragraph 27 below, a number of these supplements were processed under the real-time or 30-day notice tracks, which do not require new clinical data, despite describing the kind of significant design, component, or platform changes that 21 U.S.C. § 379i(4)(B) and 21 C.F.R. § 814.39(a) assign to the panel-track process.

27. Upon information and belief, the following PMA supplements illustrate material modifications that independently or cumulatively significantly altered the device's safety and effectiveness:

| **Supplement #** | **Decision Date** | **Supplement Type** | **Device/Model** | **Description / Relevance** |
|---|---|---|---|---|
| S025 | 01/29/2009 | Real-Time Process | Genesis RC & Eon | Design/components/ specification change |
| S028 | 03/19/2009 | 180-Day Track | Eon Mini | Manufacturer/location change |
| S058 | 09/14/2012 | Real-Time Process | Eon Mini | Design/components/ specification change |
| S066 | 03/15/2013 | Real-Time Process | Eon Mini | Design/components/ specification change |
| S068 | 05/17/2013 | Real-Time Process | Eon Mini 2.0 | Design/components/ specification change |
| S073 | 04/25/2014 | 180-Day Track | Eon Mini | Manufacturer/ location change |
| S086 | 11/13/2014 | 30-day notice | Eon Mini / Protégé / Protégé MRI | Platform/device family expansion |
| BurstDR Approval | 10/2016 | Approval | Prodigy / Proclaim Elite | BurstDR therapy approval (new stimulation pattern) |
| S125 | 07/21/2017 | 180-Day Track | Proclaim IPG Family | Platform evolution, new device family approval |
| S151 | 09/09/2019 | Real-Time Process | Proclaim SCS Family | Labeling change (indications, trade name) |
| Proclaim XR Launch | 09/26/2019 | Press Release | Proclaim XR | Recharge-free, low-dose BurstDR launch |
| S167 | 08/18/2020 | Real-Time Process | SCS IPG | Design/components/ specification change |
| S187 | 08/19/2022 | Real-Time Process | Proclaim SCS | Design/components/ specification change |
| S189 | 01/24/2023 | Panel Track | Prodigy / Proclaim / Proclaim XR | Indication expansion (e.g., DPN) |
| S213 | 06/26/2024 | 180-Day Track | SCS IPG Family | Design/components/ specification change |

28. These changes cumulatively altered the device's mode of action, safety controls, stimulation effects, battery stability, and susceptibility to failure. Abbott did not conduct new clinical trials to validate these design changes and failed to disclose material risks to physicians and patients, including Plaintiffs.

29. On September 11, 2023, the FDA classified five separate Class I recalls of Abbott's Proclaim-series SCS devices, including the Proclaim DRG IPG, XR 5/7 IPGs, and Plus 5/7 IPGs. These recalls were issued in response to complaints from patients experiencing painful electric shocks, sudden device shutdowns, and failure to deliver therapeutic stimulation. These hazards arose from the very firmware, waveform, and interface changes introduced by the above-listed supplements.

30. On May 16, 2024, Abbott initiated a recall of the Proclaim 5 Elite SCS pulse generator due to a product labeling defect. This hazard arose from changes made through the PMA supplementation process.

31. These recalls illustrate that the cumulative effect of Abbott's modifications significantly impacted device performance and patient safety. Abbott had an independent obligation under 21 C.F.R. § 814.39(a) to classify and submit supplements that materially changed the SCS device's design, components, or platform as panel-track supplements supported by new clinical data, as required by 21 U.S.C. § 379i(4)(B). Abbott instead submitted these changes as lesser-tier supplements (real-time, 180-day, 30-day notices), despite adverse event data and prior recalls showing Abbott knew the changes exceeded the scope of its existing approval. As a result, Abbott withheld, from prescribing physicians and patients, material safety information concerning the device's altered risk-benefit profile that Abbott had an independent duty to disclose. Had these changes been submitted for a new PMA, as required by 21 C.F.R. § 814.39(a), the public, medical community, and FDA advisory panels would have had the opportunity to evaluate the altered

risk-benefit profile before widespread market use.

32. Instead, Abbott was permitted to bypass that obligation. As a result, Plaintiffs received multiple devices that were fundamentally different from the system described in the original PMA, with undisclosed risks and unvalidated functionality that ultimately failed and caused their significant injury and lasting harm.

33. That decision, coupled with the FDA's tolerance of nearly 250 design-altering PMA supplements over the next 20 years, allowed Abbott to retain the litigation shield of PMA preemption while evading the corresponding regulatory burdens. Plaintiffs do not challenge Congress's establishment of the PMA-supplement regime. Rather, Plaintiffs allege that Defendant obtained approval for the design changes at issue through a series of PMA supplements that FDA classified, at Defendant's request, as lower-level changes to an already-approved device under 21 U.S.C. § 360e(d)(5)(A)(i) and 21 C.F.R. § 814.39(a), even though those changes, taken together, transformed the device originally approved. FDA's practice of accepting such supplements cannot itself expand the authority Congress conferred through that statutory term, and Defendant cannot rely on FDA's classification of its own submissions to establish that its device, as currently designed and marketed, retains the preemptive protection of the original PMA. The meaning of that statutory term — and whether FDA's classification practice remained within the authority Congress delegated — is a question for this Court's independent judgment under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), not a matter of deference to agency practice.

## V. <u>REGULATORY FRAMEWORK AND FEDERAL DUTIES</u>

34. The FDA regulates Class III medical devices under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq. Class III devices, including spinal cord stimulators, pose the highest risk to patient safety and are

subject to the most stringent regulatory controls, including premarket approval ("PMA") and post-market surveillance.

35. Manufacturers of PMA devices may not make changes that affect safety or effectiveness without prior approval of an appropriate PMA supplement: panel-track, 180-day, real-time, or 30-day notice, depending on the significance of the change and the type of data needed to support it. See 21 C.F.R. § 814.39(a); 21 U.S.C. § 379i(4)(B)-(D). This regulation imposes a nondiscretionary duty: material changes, whether in firmware, battery chemistry, stimulation parameters, user interfaces, or surgical instrumentation, require full review and public validation.

36. PMA approval also imposes ongoing federal duties, including:

- Postmarket adverse event reporting under 21 C.F.R. Part 803;
- Compliance with design controls (21 C.F.R. § 820.30);
- Manufacturing process validation (21 C.F.R. § 820.75);
- Complaint investigations and corrections under the CAPA rule (21 C.F.R. § 820.100);
- Truthful and non-misleading labeling, updated through 21 C.F.R. § 814.39(d).

37. The spinal cord stimulator implanted in Plaintiffs' bodies were not approved based on independent clinical trial data, but rather on a finding by the FDA that the device was "sufficiently similar" to other SCS systems reported in the literature. See Summary of Safety and Effectiveness Data, P010032B, § 1.11. This "sufficient similarity" standard is less rigorous than the "substantial equivalence" requirement for 510(k) Class II clearance. Yet, it served as the evidentiary basis for granting Abbott's devices the powerful preemption protections afforded by PMA status.

38. In 2001, Advanced Neuromodulation Systems (ANS), the original sponsor of this device, submitted a petition asking the FDA to reclassify its SCS

system from Class III to Class II. An expert advisory panel reviewed the data and agreed that reclassification was appropriate. The FDA overruled its own panel and denied the petition. Thereafter, the FDA approved the device as a Class III product, based not on new human clinical evidence, but on its alleged similarity to prior-generation devices.

39. That decision, by the FDA to retain Class III status against its own advisory panel's recommendation, coupled with the FDA's tolerance of nearly 250 design-altering PMA supplements over the next 20 years, allowed Abbott to retain the litigation shield of PMA preemption while evading the corresponding regulatory burdens. This conduct exemplifies a dual-track deception: one track for approval, another for modification and marketing.

40. If spinal cord stimulator manufacturers wish to benefit from PMA preemption, they must also bear the burden of compliance. Courts should not allow them to weaponize preemption as both sword and shield while quietly discarding the regulatory obligations that rationalize and support that protection.

41. The FDA has a statutory duty to prevent this erosion of Class III protections. By permitting Abbott to transform its device architecture without public clinical review, the agency has undermined the integrity of the PMA process.

## VI. <u>PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS</u>

42. Plaintiffs Johnson, Saler, Delagrange, White, and Bartlett all had similar experiences related to their interactions with Abbott's sales representatives, the lack of efficacy of their permanent devices as compared to their trial devices, and experienced various additional side effects of the device. Each Plaintiff's claims arise out of the same series of transactions or occurrences: Abbott's manufacture and marketing of the SCS device platform under PMA P010032 and its supplements; Abbott's practice of having its sales representatives, rather than physicians, program and reprogram the SCS devices in response to patient

complaints of shocks, loss of coverage, and lead or IPG migration; and Abbott's practice, through those representatives, of attributing device failures to individual, patient-specific causes rather than disclosing known failure modes. Two of the five Plaintiffs (Johnson and Delagrange) received the same Proclaim Model 3660, and both of their devices could not be placed into MRI mode. Common questions of law and fact will arise as to all Plaintiffs, including whether Abbott's Proclaim leads and IPGs deviated from their approved specifications and whether Abbott failed to report adverse events concerning these failure modes. See Fed. R. Civ. P. 20(a).

**Plaintiff Johnson**

43. On or about May 30, 2018, Mr. Johnson underwent a trial implantation of an Abbott SCS system, performed by Ben Dirkx, D.O., at Carrillo Surgery Center in Santa Barbara, California.

44. The trial system was designed, manufactured, marketed, and sold by Defendant through St. Jude Medical, which Abbott acquired in January 2017. It consisted of an External Pulse Generator (REF 3032; Serial Number ("SN") 181000315), two Octrode percutaneous leads (Model 3086; SN: 17387637 and 17387619), and a Multilead Trial Cable (Model 3013).

45. After the trial procedure, an Abbott sales representative reviewed the trial device with Mr. Johnson at his bedside. The representative programmed the external stimulator so that Mr. Johnson had access to multiple programs and stimulation settings. At his June 7, 2018 follow-up visit, Mr. Johnson reported 80 to 90 percent pain relief from the trial device, along with less numbness and tingling, easier walking, the ability to sit longer, and reduced use of pain medication.

46. Mr. Johnson met with Abbott's sales representative, Nicole, during the trial phase and again after the permanent implant. Nicole told Mr. Johnson that he could expect at least 50 percent pain relief from the Abbott SCS system. Mr. Johnson relied on that representation in agreeing to proceed with permanent

implantation.

47. On or about June 13, 2018, Mr. Johnson underwent permanent implantation of an Abbott SCS system, performed by Dr. Dirkx, at Carrillo Surgery Center in Santa Barbara, California.

48. The permanent system consisted of a Proclaim 5 Elite implantable pulse generator (Model 3660; SN: AXX896.1), two Swift-Lock Octrode leads (Model 3186; SN: 17379527 and 17354956), and anchors (Model 1192) (collectively, the "Abbott Device").

49. Right after surgery, an Abbott sales representative programmed the Abbott Device. Mr. Johnson's discharge instructions directed him to contact the device representative for help with the device.

50. After the permanent implant, an Abbott representative, Nicole, adjusted or reprogrammed the Abbott Device at least five times between 2018 and 2021, in an effort to obtain therapeutic benefit from it. The Abbott Device remains implanted in Mr. Johnson. Mr. Johnson met with the Abbott representative at his physician's office, without his physician present, and communicated with the representative directly, outside his physician's presence. The Abbott Device has since stopped delivering stimulation and no longer appears to function, although Mr. Johnson never turned it off. It provides him no pain relief.

51. Shortly after the permanent implant in 2018, Mr. Johnson began experiencing complications from the Abbott Device. These included ineffective and worsening pain, severe, painful shocking sensations, loss of balance, falls, dizziness, depression, urinary and bowel incontinence, and the inability to undergo an MRI.

52. When Mr. Johnson reported severe overstimulation and that the Abbott Device was not working, Nicole could not explain why the device was not working and never told him that it was malfunctioning or defective.

53. After the permanent implant, Mr. Johnson also began falling. When he raised the falls to the Abbott representative, Nicole told him she was not sure whether the stimulator was responsible and requested imaging to determine whether his leads had migrated. The imaging showed that the leads remained in place. Neither Nicole nor his physician could tell Mr. Johnson that anything was wrong with the Abbott Device.

54. In 2019, Mr. Johnson was scheduled for an MRI in connection with knee surgery. The Abbott representative could not place the Abbott Device into MRI mode, and Mr. Johnson could not undergo the MRI. He remains unable to undergo an MRI.

55. The Abbott Device failed to provide the pain relief Defendant represented it would provide. As a direct and proximate result of the defects in the Abbott Device and Defendant's conduct alleged in this Complaint, Mr. Johnson has suffered and continues to suffer serious physical injury, pain, emotional distress, and economic losses, including medical expenses. His physician has recommended that the Abbott Device be removed and replaced.

56. Before the implant, Mr. Johnson was told that the SCS was not a cure and would not remove all of his pain. He therefore reasonably understood his continued pain after implantation as an expected limitation of the therapy, not as a sign of a defect. After the implant, his healthcare providers recorded his pain as post-procedure soreness; two days after the permanent implant, his provider's office documented that he was "feeling well" and that his pain medication was adequate. No healthcare provider or Abbott representative ever told Mr. Johnson that his symptoms were caused by a defect in the Abbott Device. When Mr. Johnson asked about his falls, neither his physician nor Abbott's representative could give him a definitive answer, and imaging showed that his leads remained in place. Abbott's representatives instead responded to his complaints by repeatedly reprogramming

the device, which reinforced his belief that his symptoms were a matter of settings rather than a defect.

**Plaintiff Saler**

57. Before her trial implant, Ms. Saler met with an Abbott sales representative named Terry. Her physician was not present at that meeting.

58. At that meeting, representative Terry told Ms. Saler that the SCS device would help her pain "a lot," that she should no longer have severe pain going down her legs, and that the device had little to no side effects. These representations were false and misleading. Ms. Saler relied on them in agreeing to proceed with the Abbott SCS system.

59. On or about September 1, 2023, Ms. Saler underwent a trial implantation of an Abbott SCS system, performed by Dr. Alcinto Guirand in Johnstown, Pennsylvania. An Abbott representative programmed the trial device. Dr. Guirand removed the trial device at the end of the trial.

60. On or about September 1, 2024, Ms. Saler underwent a second trial implantation of an Abbott SCS system, also performed by Dr. Guirand in Johnstown, Pennsylvania. An Abbott representative programmed the second trial device. Dr. Guirand removed it at the end of the trial.

61. After the second trial and before the permanent implant, the Abbott representative met with Ms. Saler again. The representative did not tell her the permanent device would perform any differently from the trial device.

62. On or about October 18, 2024, Ms. Saler underwent permanent implantation of an Abbott SCS system, performed by Dr. Edward Gregory Andrews in Pittsburgh, Pennsylvania. An Abbott representative programmed the permanent device. The model and serial numbers of the device are in Abbott's possession through its device registration and tracking records.

63. On or about November 14, 2024, Dr. Andrews explanted the first

permanent system because of an infection at the implant site.

64. On or about January 20, 2025, Dr. Andrews implanted a second permanent Abbott SCS system (the "Abbott Device") in Pittsburgh, Pennsylvania. An Abbott representative programmed the Abbott Device. The model and serial numbers of the Abbott Device are in Abbott's possession through its device registration and tracking records.

65. Beginning on or about February 15, 2025, the Abbott Device delivered painful electrical shocks and burning sensations to Ms. Saler. She also experienced pain running down both legs.

66. Ms. Saler had the Abbott representative's direct phone number. She contacted the representative by phone, outside the presence of her physician, to report these problems. She also met with the representative in person at her pain clinic without her physician present.

67. In response to her complaints, the Abbott representative adjusted or reprogrammed the Abbott Device on three or four occasions. The adjustments did not resolve the shocking, burning, or pain. When Ms. Saler raised the problems with her treating provider, the provider suggested that Abbott adjust the device further.

68. On or about August 1, 2025, the Abbott Device was turned off. On or about August 12, 2025, Dr. Andrews surgically explanted the Abbott Device in Pittsburgh, Pennsylvania because of the shocking from the leads, the displaced pulse generator, and the pain radiating to her shoulders.

69. As a direct and proximate result of the defects in the Abbott Device and Defendant's conduct alleged in this Complaint, Ms. Saler suffered injuries. These include painful electrical shocks, burning sensations, pain down both legs, pain radiating to her shoulders, displacement of the implanted pulse generator, and the need for an additional surgery to remove the device.

70. Ms. Saler did not discover, and in the exercise of reasonable diligence

could not have discovered, that the Abbott Device was defective and that the defect caused her injuries until on or about July 6, 2026. On that date, she first learned that SCS devices had failed and injured many other patients. Before that date, Defendant's representative responded to each of Ms. Saler's complaints by reprogramming the device, treating her symptoms as a matter of settings rather than a defect. Her treating provider likewise directed her back to Abbott for adjustments. No one told Ms. Saler that her injuries were caused by a defect in the Abbott Device or that other patients had reported the same problems. Defendant's pre-implant representations that the device had little to no side effects further led her to believe her symptoms were an individual problem rather than a product defect.

**Plaintiff Delagrange**

71. Before his trial implant, Mr. Delagrange met with Abbott sales representative Olivia Anderson. Ms. Anderson told him that, although the SCS device would not be a cure, it would reduce his pain and suffering by 40 to 60 percent. Mr. Delagrange relied on these representations in agreeing to proceed with the Abbott SCS system.

72. On or about September 6, 2023, Mr. Delagrange underwent a trial implantation of an Abbott Proclaim SCS system, performed by Dr. Peter Skaliy, at Atlanta Spine Specialists in Alpharetta, Georgia.

73. Ms. Anderson met with Mr. Delagrange during the trial. She programmed the trial device and changed its settings based on his reports of pain relief.

74. On or about September 13, 2023, the trial device was removed at the conclusion of the trial.

75. After the trial and before the permanent implant, Ms. Anderson met with Mr. Delagrange again. She told him the permanent device was the "same unit" as the trial device, with the "same expectations for relief."

76. On or about September 27, 2023, Mr. Delagrange underwent permanent implantation of an Abbott Proclaim SCS Proclaim XR 5 system (formerly marketed as the Proclaim 5 Elite), including an implantable pulse generator, Model 3660, SN: CLD398.1 (the "Abbott Device"), performed by Dr. Peter Skaliy, at Atlanta Spine Specialists in Alpharetta, Georgia. Ms. Anderson programmed the Abbott Device.

77. Beginning on the day of or the day after his permanent implant, the Abbott Device failed to provide meaningful pain relief. Within the first weeks of therapy, it began delivering electrical shocks from the middle of Mr. Delagrange's back down to his foot, along with burning sensations and cramping. He also experienced worsening sciatica, numbness down his left leg into his foot, and weakness and instability in his back.

78. Mr. Delagrange repeatedly reported these problems to Abbott's representatives. Between October 2023 and about March 5, 2024, Abbott representatives met with him about 12 times, both virtually and in person, and adjusted or reprogrammed the Abbott Device in response to his complaints. In-person sessions took place at his physician's office without his physician present.

79. Ms. Anderson conducted these sessions until she left Abbott in or around November 2023. Abbott representative Mary-Carlen Fidler then took over and, from about January 11, 2024 through March 5, 2024, reprogrammed the device weekly, loading new programs that did not resolve his symptoms or restore pain relief.

80. On or about November 1, 2024, Mr. Delagrange turned the Abbott Device off, and it remains off. He turns it on only briefly from time to time to keep the battery from fully depleting. The device remains implanted in his lower back, and he will require surgery to remove it.

81. On or about August 27, 2026, the Abbott Device failed to enter MRI-

safe mode, on information and belief because its leads had migrated, which prevented Mr. Delagrange from obtaining a medically necessary MRI.

82. As a direct and proximate result of the defects in the Abbott Device and Defendant's conduct alleged in this Complaint, Mr. Delagrange suffered injuries. These include painful electrical shocks, burning sensations, numbness, worsening sciatica, back weakness and instability, the inability to undergo necessary MRI imaging, and the loss of any therapeutic benefit from the device.

83. Mr. Delagrange has suffered and continues to suffer serious physical injury, pain, emotional distress, and economic losses, including medical expenses, and he will incur further expenses for the device's removal.

84. Mr. Delagrange did not discover, and in the exercise of reasonable diligence could not have discovered, that the Abbott Device was defective and that the defect caused his injuries until after he attempted to place the device in MRI-safe mode, on or about August 27, 2026, and received a message indicating the device was subject to a manufacturer advisory notice concerning the device.

85. Before that date, Defendant's representatives responded to every complaint Mr. Delagrange made by reprogramming the device and never suggested that the device itself might be malfunctioning. In late October 2023, Mr. Delagrange told Abbott representative Olivia Anderson by text that he did not know why the device was not working, that he was not feeling better, and that he was worse than before the trial, despite having had substantial relief during the trial. Ms. Anderson did not address why the device might not be working. When Mr. Delagrange asked whether the device should be working even if it was not connected to his controller, Ms. Anderson responded "Correct," representing that the device should be functioning, and offered another programming session. When Mr. Delagrange reported the lack of relief, shocking, and burning, Abbott's representative told him to "give it time," to set up another appointment, and to try a new program. They

assured him that the device had been put in correctly and attributed his symptoms to swelling and irritation from the incision. Beginning on or about January 11, 2024, Abbott representative Mary-Carlen Fidler took over. Mr. Delagrange told her he was getting no relief and that his sciatica, cramping and burning were getting worse. Ms. Fidler responded by adjusting the device weekly and giving him new programs through about March 5, 2024. When Mr. Delagrange raised the same problems with his treating physician, the physician advised him to try different settings. At no time did any Abbott representative disclose Abbott's June 22, 2023 advisory concerning Proclaim IPGs and MRI mode, or that other patients had reported the same failures. Abbott's representatives had direct, frequent, in-person contact with Mr. Delagrange throughout this period and knew or should have known and disclosed that information.

86. Defendant did not inform Mr. Delagrange of the recall/field safety notice affecting his device. Although Defendant's representatives had direct, ongoing contact with Mr. Delagrange throughout this period, Defendant sent the notice only to an outdated address, and he never received it. He only learned of this directly from an Abbott clinician during a phone call made to Abbott Technical Support on September 28, 2026.

**Plaintiff White**

87. Before his trial implant, Mr. White met with an Abbott sales representative approximately two to three times at OrthoSports Associates in Alabama. His physician was not present at those meetings.

88. At those meetings, the Abbott representative told Mr. White that the SCS device would allow him to stop taking pain medication and delivered a sales pitch that persuaded him to try the device. The representative pressed the SCS device most actively at the time Mr. White was required to cut back on his pain medication. These representations were false and misleading. Mr. White relied on

them in agreeing to proceed with the Abbott SCS system.

89. On or about September 12, 2024, Mr. White underwent trial implantation of an Abbott SCS system in Gardendale, Alabama. An Abbott representative programmed the trial device. The trial device relieved Mr. White's pain. The trial device was removed in Gardendale, Alabama prior to permanent implant.

90. After the trial, the Abbott representative met with Mr. White again at OrthoSports Associates, without his physician present. The representative told Mr. White that the permanent device would be better than the trial device at relieving his pain. Mr. White relied on this representation in agreeing to proceed with the permanent implant.

91. On or about November 1, 2024, Mr. White underwent permanent implantation of an Abbott SCS system, in Gardendale, Alabama. An Abbott representative programmed the device at implantation.

92. Beginning on or about December 20, 2024, about seven weeks after the permanent implantation, Mr. White began experiencing complications from the Abbott device. The device provided him with no pain relief and delivered painful shocks and electrical sensations down both of his legs. He could feel the device at all times when sitting or lying down, and the device began protruding through his skin.

93. Mr. White adjusted the Abbott device's settings approximately ten times in an effort to obtain relief. None of the adjustments restored pain relief or stopped the shocks, and he ultimately left the device at a very low setting.

94. After permanent implant, Mr. White met with an Abbott representative, in or around December 2024, shortly after his symptoms began, and reported the shocks, lack of pain relief, and the device protruding through his skin. The device representative's response was that this was a normal experience. When

Mr. White raised the same issues with his treating physician, the physician likewise said it was normal experience with the device.

95. When Mr. White later told his pain management physician that he intended to have the Abbott device removed, Abbott's representatives appeared upset and questioned him about his reasoning for removal.

96. Mr. White's explant surgery was originally scheduled for February 2026 but was postponed for reasons unrelated to the device. On or about August 20, 2026, the Abbott device was turned off and not turned back on. On or about August 27, 2026, the Abbott device was surgically explanted in Gardendale, Alabama. Mr. White asked to keep the explanted device, but was told that he could not.

97. As a direct and proximate result of the defects in the Abbott device and Abbott's conduct alleged herein, Mr. White suffered various injuries. These include painful shocks and electrical sensations down both legs, pain and constant discomfort from the device when sitting or lying down, the protrusion of the device through his skin, the complete loss of the therapy the device was implanted to provide, and the need for an additional surgery to remove the device.

98. Mr. White has suffered and continues to suffer serious physical injury, pain, emotional distress, and economic losses, including the medical expenses and the cost of the surgery to remove the device.

99. Mr. White did not discover, and in the exercise of reasonable diligence could not have discovered, that the Abbott device was defective until on or about February 23, 2026. On that date, he saw an online advertisement concerning the SCS litigation and first learned that SCS devices had failed in similar fashion to his own and had injured other patients.

100. Before that date, Defendant's representative told Mr. White that his symptoms and experience were "normal". His treating physician echoed the same thing. No one told Mr. White that his injuries were caused by a defect in the Abbott

device or that other patients had reported similar injuries. Defendant's pre-implant representations that the device would allow him to stop taking his pain medication and that the permanent device would be better than the trial device, followed by the representative's assurances that his symptoms were normal, led Mr. White to believe his experience was an expected, individual outcome rather than a product defect.

**Plaintiff Bartlett**

101. Before her trial implant, Ms. Bartlett met with an Abbott sales representative named Karri. Her physician was not present at that meeting. Karri told Ms. Bartlett that the SCS device would help with her neuropathy pain. She did not disclose that the device would likely need repeated reprogramming or that it might fail to provide relief.

102. On or about August 1, 2024, Ms. Bartlett underwent a trial implantation of an Abbott SCS system in Kentucky. Karri programmed the trial device and met with Ms. Bartlett during the trial.

103. Karri told Ms. Bartlett that she needed to report at least 50 percent pain relief from the trial so that her insurance would approve a permanent implant.

104. After the trial and before the permanent implant, Karri met with Ms. Bartlett again and told her that the permanent SCS device would work better than the trial device. Ms. Bartlett relied on Defendant's representations in agreeing to proceed with the permanent implant.

105. On or about October 22, 2024, Ms. Bartlett underwent permanent implantation of an Abbott SCS system at Commonwealth Pain and Spine in Elizabethtown, Kentucky. The system included an Eterna rechargeable implantable pulse generator (Model 32400, SN: 20372343) and two Octrode leads (REF 3186, SN: 20368224 and SN: 20368308) placed at the T8 level (collectively, the "Abbott Device"). Karri programmed the Abbott Device after the implant.

106. From the time it was implanted, the Abbott Device never provided Ms. Bartlett with any relief from her neuropathy pain.

107. Beginning on or about November 1, 2024, Ms. Bartlett also experienced headaches and a burning sensation at the implant site in her left lower back. The device's battery overheated during charging and failed to hold a charge.

108. Each time the Abbott Device failed, Ms. Bartlett called Karri directly. Karri reprogrammed the device about 17 times, most recently on or about June 3, 2026. Each session took place without Ms. Bartlett's physician present, at her physician's office in Elizabethtown, Kentucky, and at another physician's office. None of the reprogramming sessions restored pain relief.

109. When Ms. Bartlett told Karri about her side effects, Karri gave no response and no explanation. When Ms. Bartlett raised her side effects with her treating nurse practitioner, her concerns were dismissed.

110. The Abbott Device remains implanted. Ms. Bartlett will require surgery to remove it.

111. As a direct and proximate result of the defects in the Abbott Device and Defendant's conduct alleged in this Complaint, Ms. Bartlett suffered injuries. These include headaches, burning pain at the implant site, the burden and risk of an overheating battery, and the complete loss of the therapy the device was implanted to provide.

112. Ms. Bartlett did not discover, and in the exercise of reasonable diligence could not have discovered, that the Abbott Device was defective and that the defect caused her injuries until on or about March 1, 2026. On that date, she first learned that other patients had reported that SCS devices failed and caused injuries.

113. Before that date, Defendant's representative told Ms. Bartlett that the permanent device would work better than the trial. When it failed, the representative responded only by repeatedly reprogramming it. The representative also gave no

response to Ms. Bartlett's reports of side effects and never told her that her symptoms could be caused by a defect or that other patients had reported the same problems. Her nurse practitioner dismissed her complaints. This conduct led Ms. Bartlett to believe the device's failures were a programming issue unique to her rather than a product defect.

114. All leads used in the SCS systems implanted in Plaintiffs were manufactured and sold by Abbott or its predecessors.

115. As a direct and proximate result of the defective and misrepresented nature of the device, Plaintiffs suffered physical injury, worsening pain, emotional distress, and economic damages including medical expenses and loss of quality of life.

116. Plaintiffs discovered the probable causal relationship between their injuries and Abbott's conduct only after experiencing continued device-related complications, removal of the device (as to Plaintiffs Saler and White), and finally being informed about the underlying facts of the SCS that contradicted Abbott's representations.

117. Until Plaintiffs learned the underlying facts of the safety and efficacy of Abbott's SCS devices, they continued to believe that their conditions and the efficacy of the devices were an aberration limited to themselves and not caused by a pattern and practice of Abbott.

118. During all times relevant to this Complaint Abbott fraudulently concealed from Plaintiffs the truth regarding the safety and efficacy of the SCS devices, and Plaintiffs could not have, with reasonable due diligence, determined such truth. In fact, to this day, Abbott continues to insist that its SCS devices are safe and efficacious.

## VII. ADDITIONAL FACTUAL ALLEGATIONS SUPPORTING LIABILITY

119. At all times relevant to this Complaint, Abbott Laboratories or its predecessors were responsible for the design, manufacture, testing, labeling, promotion, sale, post-market surveillance, and regulatory compliance of the spinal cord stimulator (SCS) systems implanted in Plaintiffs.

120. The devices marketed to Plaintiffs and their healthcare providers as the Proclaim and Eterna SCS systems bore little resemblance to the device originally approved under PMA P010032. These devices incorporated multiple significant changes to their hardware, firmware, user interface, waveform architecture, battery system, and wireless programming, each of which materially impacted the devices' safety, performance, and failure modes.

121. Despite these changes, Abbott never submitted a new PMA. Instead, the company submitted more than 230 piecemeal supplements—many of which were processed under expedited review programs, including 30-day notices and real-time reviews—avoiding panel-track scrutiny and clinical revalidation.

122. Abbott failed to disclose that the devices implanted in Plaintiffs' bodies had never been tested through a full PMA-level clinical trial in human patients. The original approval of PMA P010032 was based not on manufacturer-sponsored trials, but on FDA conclusions that the Genesis system was "sufficiently similar" to other devices discussed in the literature. This flawed evidentiary standard was accepted by the FDA only after it overruled its own expert advisory panel, which had recommended reclassifying SCS devices from Class III to Class II.

123. Abbott relied on the full preemption shield of PMA status to market its device as safe and effective, while knowingly and repeatedly altering the system beyond what was originally validated. It failed to notify physicians or patients that

the implanted device:

- Used firmware-dependent control systems absent from the predicate;
- Allowed smartphone-based patient programming via Bluetooth;
- Delivered burst and high-frequency stimulation patterns not subject to human testing under the PMA;
- Was affected by lead migration, high lead impedance, communication delays, and lead short circuits, as documented in MAUDE reports and adverse event summaries.

124. As previously alleged, between 2020 and 2023, Abbott initiated multiple recalls involving the Proclaim system. On September 11, 2023, the FDA classified five recalls of Abbott's Proclaim XR and Proclaim DRG IPGs as Class I—its most serious category, reserved for devices that may cause serious injury or death.

125. These recalls were issued in response to patient complaints of:

- Painful electrical shocks;
- Sudden unintended stimulation;
- Loss of therapy;
- Device failure during recharging;
- Malfunctioning wireless communication and programming failures.

126. These malfunctions were directly linked to design and firmware changes made in PMA supplements between 2017 and 2022, including supplements S036 (Bluetooth programming), S043 (Proclaim XR rebranding), and subsequent firmware updates approved in S051–S062. Abbott knew or should have known that these cumulative changes significantly altered the device's safety and effectiveness.

127. On May 16, 2024, Abbott initiated a recall of the Proclaim 5 Elite SCS pulse generator due to a product labeling defect, arising from product labeling changes it had made to the device in Supplement S151. The product labeling of the

Proclaim Elite SCS system was never subjected to PMA review and scrutiny.

128. Abbott failed to update product labeling, device manuals, or promotional materials to reflect the true performance characteristics of the altered device. Nor did it warn physicians or patients of the risks of stimulation failure, lead migration, high lead impedance, lead short circuits, nerve damage, and device failure—despite mounting adverse event reports and internal design change documentation.

129. Abbott also failed to maintain adequate design validation and risk analysis documentation as required under 21 C.F.R. § 820.30(g), and failed to investigate and address post-market complaints as required by 21 C.F.R. § 820.198 and § 820.100.

130. These violations of FDA-mandated Current Good Manufacturing Practices (cGMPs) were not isolated or inadvertent. They reflect a systemic disregard for regulatory obligations, a practice of iterative design without public revalidation, and a prioritization of market expansion over patient safety.

131. The defects in the Eterna and Proclaim systems, their design, firmware, labeling, and risk disclosure, were a direct and proximate cause of Plaintiffs' injuries. These defects existed at the time the device left Abbott's control and were not known or reasonably knowable to Plaintiffs or their physicians at the time of implantation.

132. At all relevant times, Plaintiffs used the product as intended and in a foreseeable manner. The product failed to perform as represented, and the manifested risks were not disclosed in the device's labeling, Instructions for Use (IFU), or patient education materials.

133. Abbott's conduct was knowing, deliberate, and reckless. It knowingly placed a materially altered medical device into the stream of commerce, misrepresented its safety and approval status, and failed to correct known defects

through regulatory pathways available under federal law.

134. Upon information and belief, the Eterna and Proclaim SCS system and related system components implanted in Plaintiffs deviated from Abbott's FDA-approved manufacturing specifications for firmware execution stability, wireless programming reliability, lead and IPG fixation, and IPG output. These deviations resulted in stimulation shutoff, painful electric shocks, and therapy loss, all of which Plaintiffs experienced and have been reported by other users of the same device model.

135. The malfunctions leading to recalls of the Proclaim system reflect systemic deficiencies in Abbott's manufacturing processes and a failure to conform to its Quality System Regulation (QSR) obligations under 21 C.F.R. §§ 820.30(g), 820.75, 820.198, and 820.100. Abbott failed to adequately validate or monitor these performance characteristics post-market, despite prior complaints and adverse event reports.

136. The devices implanted in Plaintiffs were not reasonably safe at the time they left Abbott's and its predecessor's control, and their malfunction during regular use, which included loss of therapy and the need for surgical revision and/or removal, were a direct and foreseeable consequence of Abbott's failure to ensure adherence to its approved manufacturing controls. Plaintiffs' injuries were not caused by a known or disclosed risk; rather, they stemmed from defects in the execution of the product's firmware and power management systems, which were neither tested nor monitored in accordance with binding federal regulations. Moreover, these injuries resulted from latent manufacturing deviations, particularly in lead integrity, firmware execution, and power management, that were not reflected in labeling or IFU and were undetectable by implanting physicians.

## VIII. ABBOTT'S FAILURE TO REPORT ADVERSE EVENTS AND DIRECT COMMUNICATIONS WITH PLAINTIFFS

137. Federal law requires a device manufacturer to report to FDA within 30 calendar days: information that reasonably suggests that its marketed device may have caused or contributed to a serious injury or has malfunctioned and would be likely to cause or contribute to a serious injury if the malfunction were to recur. 21 C.F.R. § 803.50(a).

138. Before each Plaintiff's implantation, Abbott received complaints and other information reasonably suggesting that its Proclaim IPGs and associated leads had malfunctioned or caused serious injury through painful shocks, high lead impedance and lead short circuits, lead migration and IPG rotation, and loss of therapy. Upon information and belief, Abbott failed to report a substantial number of these events to FDA, reported them late, or characterized them in a manner that obscured the device's role.

139. Abbott's own MDRs to FDA confirm that Abbott knew of these failure modes before Plaintiffs' implantations. Counting only publicly-available, Abbott-filed reports for Proclaim IPGs, Model 3660, received by FDA on or after September 30, 2020, when reports filed under Abbott Medical name first appear for that model, Abbott reported at least 90 events involving high or abnormal lead impedance, 56 involving device or lead migration, and 11 involving shocks before Plaintiff Delagrange's September 27, 2023 implant; and at least 104 impedance, 92 migration, and 17 shock events before the last of Plaintiffs' implants, on January 20, 2025. See, e.g., MDR Nos. 1627487-2020-32070 (high impedance; IPG inoperable; system explanted and replaced; received by FDA October 1, 2020); 1627487-2024-07658 (high impedance and shocks at the IPG site that resolved when the system was turned off; system explanted); 1627487-2024-00581 (high impedance and loss of therapy; patient "did not report any falls or traumas");

1627487-2021-02127 (migration; patient "denied any recent trauma").

140. Abbott repeatedly characterized such events in its reports in a manner that obscured the device's role. Abbott coded reports describing high lead impedance, shocks, and lead migration as "Adverse Event Without Identified Device or Use Problem," see, e.g., MDR Nos. 1627487-2024-07197, 1627487-2024-10072, 1627487-2024-12604, and closed the substantial majority of its Proclaim IPG investigations as "inconclusive" because the device was "not returned for analysis."

141. Abbott's handling of the MRI-mode failure illustrates the pattern. As early as November 2020, Abbott reported a Proclaim IPG that was stuck in MRI mode and "could not be recovered," which Abbott attributed to its own representative's deletion of pairing data from the clinician programmer, and coded the event as a "Wireless Communication Problem." See MDR No. 1627487-2020-48065 (received November 20, 2020). Beginning in April 2021, Abbott filed reports describing Proclaim IPGs that could not be taken out of MRI mode and required surgical replacement, see, e.g., MDR Nos. 1627487-2021-13410 (event March 26, 2021), 1627487-2021-17984, 1627487-2021-18593, but coded them as a generic "Wireless Communication Problem" and attributed them to patient or programmer issues. After issuing what its own MDRs describe as its June 22, 2023 advisory notice, Abbott filed, on or about July 19–20, 2023, approximately twenty reports of the same failure involving events that occurred between 2017 and 2022, including MDR Nos. 1627487-2023-03439 (March 14, 2017 event), 1627487-2023-03449 (April 26, 2018 event), 1627487-2023-03447 and -03448 (October 2021 events), and 1627487-2023-03460, -03462, and -03477 (June 2022 events). Abbott issued that advisory before Plaintiff Delagrange's September 27, 2023 implant. Two of those late-reported events, from March 14, 2017 and April 26, 2018, also occurred before Plaintiff Johnson's June 13, 2018 implant, yet Abbott did not report them for

more than five years; in 2019, Plaintiff Johnson's own Proclaim IPG, Model 3660, could not be placed into MRI mode, and he remains unable to undergo an MRI. Abbott's reports also show that it knew Proclaim IPGs could fail to enter MRI mode at all: before Plaintiff Delagrange's implant, Abbott filed at least 16 reports of Proclaim IPGs that could not be placed into MRI mode, 14 of which involved abnormal lead impedance, and many of which resulted in surgical explant or replacement of the system. See, e.g., MDR Nos. 1627487-2020-48338 (system unable to enter MRI mode due to impedance problems; entire system explanted and replaced; received by FDA November 28, 2020); 1627487-2021-02339 (patient unable to place IPG into MRI mode; one lead had high impedance and had fractured); 1627487-2021-15417 (system would not go into MRI mode due to low impedance; patient needed MRI; system explanted). Abbott's representatives nonetheless met with Plaintiff Delagrange and reprogrammed his Proclaim IPG, Model 3660, approximately twelve times without disclosing either MRI-mode failure, and his device later failed to enter MRI-safe mode, preventing him from obtaining a medically necessary MRI.

142. Before any Plaintiff's implantation, Abbott had already issued at least two physician advisories acknowledging device failures in the Proclaim IPG family that required surgical replacement. These advisories show that Abbott knew, before all Plaintiffs' implantations, that firmware and software defects in the Proclaim IPG platform were causing device failures requiring surgical replacement. Abbott's own MDRs describe these advisories as its June 2, 2017 notice that its neuromodulation IPGs could become inoperable when exposed to monopolar electrosurgery and its September 12, 2017 notice of an inaccurate elective replacement indicator, both of which predate Plaintiff Johnson's June 13, 2018 implant. Abbott later issued its June 22, 2023 advisory concerning IPGs unable to exit MRI mode, before Plaintiff Delagrange's implant, and its May 3, 2024 advisory concerning a late elective

replacement indicator message, before Plaintiffs Saler's, White's, and Bartlett's implants.

143. Information reported to FDA under 21 C.F.R. Part 803 is published in FDA's MAUDE database, which is searchable by device and by reported device problem, and the FDA regularly publishes manufacturers' reports there. Physicians who implant and manage SCS devices, including Plaintiffs' implanting and treating physicians, rely on MAUDE data, FDA safety communications, and the medical literature drawing on them in selecting devices, counseling patients, and evaluating device complaints. Because Abbott failed to report, reported late, or coded these events as involving no identified device problem, the MAUDE data available to Plaintiffs' physicians understated the frequency of, and masked the device's role in, the same failure modes each Plaintiff later experienced. Had Abbott timely and accurately reported these events, that information would have reached Plaintiffs' physicians, and (a) the physicians would not have recommended the Abbott SCS systems, or would have disclosed these risks to Plaintiffs, who would not have consented to implantation; and (b) after implantation, when each Plaintiff reported shocks, loss of coverage, or migration, the physicians would have recognized those symptoms as device failures and revised or explanted the device sooner, rather than permitting repeated reprogramming or by reassurance by Abbott's representatives, sparing Plaintiffs months of ineffective and painful therapy.

144. The applicable law of each Plaintiff's state imposes on manufacturers a general duty to use reasonable care and to warn of risks they know or should know of, a duty that may be discharged by conveying the information to a third party, such as FDA, through which it will reach the physicians and patients whose safety depends on it. Abbott breached that duty by failing to timely and accurately submit the adverse event reports required by 21 C.F.R. § 803.50(a), as alleged above. That duty is a traditional state-law duty owed to Plaintiffs; it exists independently of, and

predates, the federal reporting requirements. Plaintiffs do not contend that state law required Abbott to give physicians or patients any warning beyond what federal law requires. Plaintiffs' failure-to-warn and negligence claims rest in part on Abbott's failure to report adverse events to FDA as federal law required, a duty that parallels, and is no broader than, Abbott's federal reporting obligations.

145. In addition, Abbott's representatives communicated directly with Plaintiffs, frequently outside the presence of their physicians, regarding the devices' expected performance, the causes of their symptoms, and the reprogramming of their devices, including Representatives Olivia Anderson's and Mary-Carlen Fidler's approximately twelve reprogramming sessions with Plaintiff Delagrange at his physician's office without his physician present; Representative Karri's calls with Plaintiff Bartlett, her approximately seventeen reprogramming sessions without Plaintiff Bartlett's physician present, and her instruction that Plaintiff Bartlett report at least 50 percent pain relief from her trial; the representative's calls and in-person meetings with Plaintiff Saler at her pain clinic without her physician present; the representative's meetings with Plaintiff White at OrthoSports Associates without his physician present, both before his trial implant, when the representative told him the device would allow him to stop taking his pain medication, and after the trial, when the representative told him the permanent device would be better than the trial device, as well as the representative's dismissal of Plaintiff White's reported shocks and device protrusion as "normal"; and Representative Nicole's statement to Plaintiff Johnson that he could expect at least 50 percent pain relief, and her reprogramming of his device at least five times between 2018 and 2021, including in-person sessions at his physician's clinic without his physician present. These communications were made directly to Plaintiffs and not to or through any learned intermediary.

## CAUSES OF ACTION

## COUNT I: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT

(Applicable State Product Liability Law)

146. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

147. At all times relevant to this action, Abbott Laboratories (hereafter reference to Abbott Laboratories shall include any applicable predecessor company, including St. Jude Medical) was engaged in the business of designing, manufacturing, testing, labeling, distributing, and selling medical devices, including the spinal cord stimulator systems implanted in Plaintiffs.

148. The devices implanted in Plaintiffs were not reasonably safe for their intended use due to a manufacturing defect. The products, as manufactured and sold, deviated from Abbott's own FDA-approved specifications and did not conform to the design and performance standards described in PMA P010032 and its associated supplements.

149. Specifically, as detailed in preceding allegations, the Eterna and Proclaim systems implanted in Plaintiffs failed to conform with federal Quality System Regulations, including 21 C.F.R. §§ 820.30(g) (design validation), 820.75 (process validation), 820.100 (corrective and preventive action), and 820.198 (complaint handling). These violations resulted in defects in lead integrity (including high lead impedance and lead short circuits), lead and IPG fixation, and firmware execution.

150. These deviations were not theoretical. Plaintiffs' implanted device failed during normal and foreseeable use, producing painful sensations, stimulation loss, and other adverse effects that led to surgical revision and/or removal and permanent injury.

151. Plaintiffs' injuries were not caused by a known or inherent risk of the device when properly manufactured, but rather by a departure from its intended and approved construction. The product failed to perform as represented, and it would not have failed but for Abbott's failure to comply with FDA-mandated specifications and manufacturing protocols.

152. Under California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky law, Abbott is strictly liable for injuries caused by a manufacturing defect that rendered the device unreasonably dangerous at the time it left its control. As to Plaintiff White, this Count is brought under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").

153. As a direct and proximate result of the manufacturing defect in the device, the Plaintiffs suffered physical injury, pain, medical expenses, loss of enjoyment of life, and other damages.

**COUNT II: STRICT PRODUCTS LIABILITY – FAILURE TO WARN**

(Failure to Warn Under Applicable State Law)

154. Plaintiffs incorporate by reference allegations set forth above as though fully set forth herein.

155. At all times relevant, Abbott Laboratories had a duty to provide adequate warnings and instructions regarding the known or reasonably foreseeable risks associated with its spinal cord stimulator system, including the Eterna and Proclaim systems.

156. Under California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky law, a product is defective if it is unreasonably dangerous due to the absence of adequate warnings or instructions. This duty extends to risks known or knowable in light of the scientific, clinical, or regulatory knowledge available at the time the product was marketed and distributed.

157. The spinal cord stimulator devices implanted in Plaintiffs were

materially altered from the system originally approved under PMA P010032. The systems they received included firmware-driven stimulation control, Bluetooth-enabled programming interfaces, and high-density waveform functionality that were never clinically validated in human trials or publicly disclosed at the time of approval.

158. Abbott failed to update its Instructions for Use (IFU), patient education materials, and physician-facing labeling to disclose: the risk of painful stimulation spikes or loss of therapy due to high lead impedance and lead short circuits; the instability of firmware updates and potential for loss of device communication; the risk of lead migration and IPG rotation in the absence of trauma; the risk that the device could not exit MRI mode; the increased rate of lead migration and therapy failure reported post-market; the cumulative nature of the device's evolution, and that its current form bore little resemblance to the device described in PMA P010032 or its Summary of Safety and Effectiveness Data.

159. The failure to warn was compounded by Abbott's internal knowledge of these risks, including MAUDE reports, post-market complaint data, and prior design and validation issues. Despite this knowledge, Abbott continued to represent the device as "safe and effective" and failed to initiate field safety notifications, device labeling changes, or provider education consistent with 21 C.F.R. § 814.39(d) or 21 C.F.R. § 820.198.

160. Independently, Abbott breached its state-law duty to warn by failing to timely and accurately report adverse events to FDA as required by 21 C.F.R. Part 803, as alleged above in Section VIII.

161. Plaintiffs and their healthcare providers reasonably relied on Abbott's representations and omissions in deciding to proceed with implantation of the SCS devices. Had they been adequately warned of the known risks, the device would not have been implanted, or alternative treatments would have been pursued.

162. Plaintiffs' injuries were caused in whole or in part by Abbott's failure to warn of known or knowable dangers associated with the use of its product. These failures rendered the device unreasonably dangerous for its intended use and constitute a defect under California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky law. As to Plaintiff White, this Count is brought under the AEMLD.

163. As a direct and proximate result of Abbott's failure to warn, Plaintiffs suffered physical injury, pain, medical costs, surgical intervention, emotional distress, and other damages.

## COUNT III: NEGLIGENCE PER SE – FEDERAL REGULATORY VIOLATIONS

(Under Applicable State Law)

164. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

165. Under California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky law, a person injured by the violation of a statute or regulation intended to protect the class of persons to which that person belongs may recover damages under a theory of **negligence per se**.

166. Abbott Laboratories was subject to, and violated, multiple non-discretionary federal duties that were enacted for the protection of public health and safety. These duties are embodied in the Food, Drug, and Cosmetic Act (FDCA), the Medical Device Amendments of 1976, and FDA regulations promulgated thereunder, including:

**21 C.F.R. § 814.39(a)** – requiring a PMA supplement, with the review track (panel-track, 180-day, real-time, or 30-day notice) determined by the significance of the change and the clinical data needed to support it before implementing changes that may affect device safety or effectiveness;

**21 C.F.R. § 803.50** – mandating adverse event reporting;

**21 C.F.R. § 820.30(g)** – requiring design validation under expected use conditions;

**21 C.F.R. § 820.75** – requiring process validation to ensure consistent device output;

**21 C.F.R. § 820.198** – requiring investigation of complaints;

**21 C.F.R. § 820.100** – mandating corrective and preventive action (CAPA) when product failures are identified;

**21 C.F.R. § 814.39(d)** – requiring labeling updates in response to known risks.

167. State common law independently imposes on manufacturers of implantable medical devices a duty to design, validate, and monitor their products with reasonable care, and to investigate and act on known safety complaints; that duty exists independent of, and is not created by, the FDCA or its implementing regulations. The federal regulatory violations alleged herein are pled as evidence of the standard of care applicable to an independently existing state-law duty, as the source of a specific, ascertainable requirement that parallels a pre-existing state-law duty, not as an attempt to enforce the FDCA itself or to impose a requirement different from, or in addition to, the requirement the FDCA already imposes on Abbott.

168. These devices implanted in Plaintiffs materially deviated from the system approved in PMA P010032. They incorporated design and firmware changes that altered their safety profile, yet Abbott failed to submit a new PMA or a panel-track supplement, as required by 21 U.S.C. § 379i(4)(B) and 21 C.F.R. § 814.39(a), (c). Abbott instead submitted piecemeal supplements and exploited expedited review programs to bypass clinical safety validation.

169. Abbott also failed to report adverse events linked to stimulation shutoff, therapy loss, and electrical shocks under 21 C.F.R. § 803.50. These adverse

effects were known to Abbott prior to Plaintiffs' implantation and were consistent with reports subsequently leading to Class I recalls in 2023.

170. Abbott violated design and manufacturing regulations by failing to validate the performance of its firmware-dependent stimulation control, Bluetooth-based programming, and battery recharging systems. It also failed to initiate CAPA processes in response to known problems, and did not investigate or disclose known product complaints in accordance with 21 C.F.R. §§ 820.100 and 820.198.

171. Each of these violations constitutes a breach of federal laws that were designed to protect a class of persons, of which Plaintiffs are members, against a particular type of harm.

172. Plaintiffs are members of the class of persons these statutes and regulations are intended to protect: patients receiving high-risk Class III medical implants under the FDA's PMA regulatory framework. Plaintiffs' injuries are of the type these laws are intended to prevent—namely, harm resulting from undisclosed and unremedied device malfunctions that occur due to failures in quality systems, post-market reporting, and product validation.

173. As a direct and proximate result of Abbott's violations of federal regulations and California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky law, Plaintiffs suffered compensable physical injury, pain, medical costs, loss of enjoyment of life, and other damages.

174. These regulatory violations were not merely technical infractions, but material breaches of duties specifically intended to prevent the type of harm suffered by Plaintiffs—namely, therapy loss, neurological injury, and delayed surgical intervention due to systemic firmware and charging failures.

## COUNT IV: BREACH OF EXPRESS WARRANTY

(Under Applicable State Law)

175. Plaintiffs incorporate by reference all allegations set forth above as

though fully set forth herein.

176. Under Illinois law, an express warranty is created when a seller makes an affirmation of fact or promise to the buyer that relates to the goods and becomes part of the basis of the bargain. See 810 ILCS 5/2-313; *Happel v. Wal-Mart Stores, Inc.*, 766 N.E.2d 1118, 1123–24 (Ill. 2002). California, Pennsylvania, Georgia, Alabama, and Kentucky law are in accord.

177. Prior to the implantation of the Eterna and Proclaim spinal cord stimulator devices, Abbott Laboratories made explicit representations in its promotional materials, device labeling, IFU, public statements, and directly to Plaintiffs through its sales representatives that the device was safe, effective, reliable, and had been adequately tested for use in human patients suffering from chronic pain.

178. Abbott expressly warranted that its SCS devices provided consistent pain relief, seamless therapy delivery, safe wireless programming, and a rechargeable platform with superior reliability and patient comfort. Abbott's provider materials represented that its SCS systems were "FDA-approved," "clinically validated," and "designed for long-term use with low complication rates." These claims were repeated in sales brochures, website copy, and Abbott's physician training materials. These claims were repeated directly to Plaintiffs through Abbott's sales representatives prior to each of their implant decisions.

179. These affirmations and promises became part of the basis of the bargain between Abbott and Plaintiffs, as well as Plaintiffs' implanting physician. Plaintiffs and their physician relied on these representations to proceed with the implantation of the Eterna and Proclaim systems.

180. In fact, the Eterna and Proclaim system implanted in Plaintiffs had never undergone clinical validation in its final marketed form. The FDA approved the system based on "sufficient similarity" to earlier devices, not on Abbott-

sponsored clinical trial data specific to the device actually implanted. Abbott failed to disclose that its device had been significantly altered through nearly 250 PMA supplements, nor that these changes materially affected the device's safety and reliability.

181. The device failed to perform as promised. Plaintiffs experienced therapy loss, painful electrical sensations, device communication failure, and required surgical revision and/or removal. The product was not safe, effective, or reliable as expressly warranted by Abbott, and Abbott failed to provide adequate warnings or updates contradicting its original claims.

182. Abbott's breach of its express warranties directly and proximately caused Plaintiffs' injuries. Had the device performed as warranted, Plaintiffs would not have suffered worsening pain, adverse neurological symptoms, or required surgical intervention.

183. As a result of this breach of express warranty, Plaintiffs are entitled to recover all compensatory damages allowed under applicable law, including medical expenses, pain and suffering, and other economic and noneconomic losses.

## COUNT V: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE

(Under Applicable State Law)

184. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

185. Under Illinois law, a seller who is a merchant with respect to goods of that kind warrants that the goods shall be merchantable and fit for the ordinary purposes for which such goods are used. California, Pennsylvania, Georgia, Alabama, and Kentucky law are in accord.

186. Abbott Laboratories is a merchant engaged in the business of manufacturing, marketing, and selling spinal cord stimulator systems, including

systems implanted in Plaintiffs. These devices are used for the ordinary purpose of treating chronic pain through safe and effective neuromodulation therapy. Plaintiffs did not discover, and could not have reasonably discovered, the breach of Abbott's implied warranties until the dates alleged in Section VI above; Abbott's fraudulent concealment of the device's true safety and efficacy tolled and continues to toll the running of any applicable limitations period as to Plaintiffs' claims. Abbott continues to deny that there are any problems with the relevant devices.

187. When Abbott marketed and sold its SCS systems implanted in Plaintiffs, it impliedly warranted that the devices were of merchantable quality, conformed to FDA-approved specifications, and were reasonably safe for its intended medical purpose. Abbott also impliedly warranted that the devices were fit for the specific purpose of long-term implantation to treat Plaintiffs' condition, as recommended by their physician(s).

188. The devices implanted in Plaintiffs were not of merchantable quality, nor were they fit for their intended purpose. They failed to operate as expected due to known defects in firmware execution, wireless programming, lead integrity, lead and IPG fixation, and therapy delivery. Plaintiffs experienced painful shocks, therapy failure, and ultimately underwent surgical revision and/or removal due to the product's unreliability and malfunction.

189. These failures were not caused by misuse or physician error. They were the direct result of design-altering changes Abbott implemented without corresponding clinical testing or validation, and without disclosing these risks in labeling or provider materials. The devices failed to conform to the minimum standards of merchantability and fitness for long-term neuromodulation therapy.

190. Abbott's breach of implied warranties was a proximate cause of Plaintiffs' injuries, including physical pain, surgical intervention, economic loss, and emotional distress. Plaintiffs would not have consented to the implantation had

they or their physician(s) known the device was unfit for its intended use.

**COUNT VI: NEGLIGENCE**

(Under Applicable State Law)

191. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

192. Abbott Laboratories owed Plaintiffs a duty of reasonable care in the design, development, manufacture, labeling, testing, marketing, sale, and post-market surveillance of the spinal cord stimulator systems that it placed into the stream of commerce.

193. Abbott breached its duty of care in one or more of the following ways:

a. By negligently failing to ensure that the devices were manufactured in accordance with FDA-approved specifications, including labeling, firmware, battery safety, lead integrity, and programming reliability standards;

b. By negligently introducing cumulative design changes through successive PMA supplements without proper validation, public clinical testing, or physician disclosure;

c. By negligently failing to investigate known risks associated with stimulation loss, painful shocks, and therapy failure, despite premarket complaints, post-market adverse event reports, and internal device testing;

d. By negligently failing to update its IFU, provider communications, or promotional materials in accordance with 21 C.F.R. § 814.39(d) and 21 C.F.R. § 820.198, despite known malfunctions;

e. By negligently failing to report adverse events related to its Eterna and Proclaim SCS systems in accordance with 21 C.F.R. Part 803;

f. By failing to initiate corrective and preventive actions under 21 C.F.R. § 820.100 after receiving adverse reports of stimulation instability, lead migration, or battery failure consistent with the experience of Plaintiffs and other patients.

194. These negligent acts and omissions constitute breaches of Abbott's duty of reasonable care under state common law -- a duty that exists independent of, and is not created by, the FDCA. See Restatement (Third) of Torts: Products Liability § 2 cmt. a. The federal regulatory violations identified above, including 21 C.F.R. Part 803, 21 C.F.R. §§ 820.30(g), 820.75, 820.100, 820.198, and 814.39(a)-(d), are pled as evidence of the standard of care applicable to that independently existing duty, not as the source of the duty itself, and are not preempted under *Riegel v. Medtronic* or *Buckman v. Plaintiffs' Legal Committee*. Abbott's deviation from these standards was not isolated, but systemic, as evidenced by repeated internal and public reporting of identical failure modes across multiple product models.

195. Illinois law similarly imposes a duty on manufacturers to exercise ordinary care in the design, manufacture, labeling, and distribution of medical devices, including duties to investigate known hazards and warn of risks not adequately disclosed. California, Pennsylvania, Georgia, Alabama, and Kentucky law are in accord.

196. Abbott's breach of its duties of care caused Plaintiffs' injuries. As alleged above, Plaintiffs suffered painful device malfunction and therapy failure resulting in surgical revision and/or removal of the SCS system. These harms were foreseeable and preventable had Abbott exercised reasonable care.

197. As a direct and proximate result of Abbott's negligence, Plaintiffs suffered physical pain, emotional distress, financial harm, and other compensable damages under California, Pennsylvania, Georgia, Alabama, Kentucky, and Illinois law.

**COUNT VII: NEGLIGENT MISREPRESENTATION**

(Under Applicable State Law)

198. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

199. At all times relevant, Abbott Laboratories, in the course of its business, made representations to healthcare providers, patients, and the general public regarding the safety, effectiveness, regulatory status, and performance of its spinal cord stimulator systems.

200. Abbott represented, through promotional materials, IFU, patient education resources, and provider training, that its SCS devices: were safe and effective for the long-term treatment of chronic pain; were fully FDA-approved and compliant with all applicable regulations; had been validated through rigorous clinical trials or otherwise demonstrated safe through FDA-approved testing; and maintained reliability in therapy delivery, stimulation programming, and battery recharging.

201. These representations were false. As set forth in the preceding allegations, Abbott failed to disclose that: the Eterna and Proclaim devices had never been clinically validated in their marketed form; these devices had undergone significant design and firmware changes through more than 230 PMA supplements; these changes materially altered its performance and introduced new, untested risks; and multiple recalls and adverse events had already emerged related to therapy shutoff, stimulation spikes, battery failure, and wireless programming.

202. Abbott made these misrepresentations and omissions in a commercial context, intending physicians and patients to rely on them in making decisions regarding device selection, implantation, and long-term management.

203. Abbott also made these misrepresentations directly to Plaintiffs through its sales representatives, who misrepresented to Plaintiffs that the

permanent SCS systems would provide Plaintiffs with long term pain relief, were safe and backed by clinical validation, would be functionally equivalent to the trial SCS system, and would alleviate Plaintiffs' need to receive other treatment for their chronic pain.

204. Plaintiffs' treating physician reasonably relied on Abbott's misrepresentations when selecting the Abbott system for implantation. Plaintiffs, in turn, relied on the statements made by Abbott in patient-directed materials and directly to Plaintiffs by Abbott's sales representatives, including assurance of FDA approval, therapy safety, and reliability, when consenting to implantation. Plaintiff Johnson relied on the representative's statement that he could expect at least 50 percent pain relief from the Abbott SCS system in electing permanent implantation; Plaintiff Saler relied on the representative's statements that the device would help her pain "a lot" and had little to no side effects in electing implantation; Plaintiff Delagrange relied on the representative's statements that the device would reduce his pain by 40 to 60 percent and that the permanent device was the "same unit," with the "same expectations for relief," as the trial device in electing permanent implantation; Plaintiff White relied on the representative's statements that the device would allow him to stop taking his pain medication in electing implantation, and that the permanent device would be better than the trial device in electing permanent implantation; and Plaintiff Bartlett relied on the representative's statement that the permanent device would work better than the trial device in electing permanent implantation.

205. Abbott failed to exercise reasonable care in obtaining or communicating accurate information about the device's clinical validation, safety risks, and actual approval history. A reasonable manufacturer in Abbott's position would have known, or should have known, that its cumulative modifications had introduced serious safety issues and altered the nature of the devices from its

predicate.

206. As a direct and proximate result of Abbott's negligent misrepresentations and omissions, Plaintiffs suffered foreseeable physical and economic harm, including the pain and cost of unnecessary and dangerous implantation, revision surgery, and/or removal.

207. For avoidance of doubt, Plaintiffs allege misrepresentations were made to them and their healthcare providers, not the FDA.

## <u>COUNT VIII: FRAUDULENT CONCEALMENT</u>

(Under Applicable State Law)

208. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

209. At all times relevant, Abbott Laboratories had superior knowledge of critical facts concerning the safety, efficacy, and approval history of its spinal cord stimulator systems—information not available to Plaintiffs, their treating physician(s), or the general public.

210. Abbott was under a duty to disclose material facts relating to the performance and risks of the Eterna and Proclaim systems due to: exclusive access to adverse event reports and internal product complaint data; control over PMA supplement disclosures and labeling updates; direct and indirect representations to patients and physicians; statutory and regulatory duties under 21 C.F.R. §§ 803.50, 814.39, and 820.198 to disclose newly acquired safety information.

211. Abbott actively concealed or failed to disclose that: the SCS systems had undergone extensive, untested design and firmware changes; the FDA had approved the devices based only on similarity to legacy SCS systems, not on new clinical trial data; known issues with therapy interruption, painful shocks, high lead impedance and lead short circuits, lead migration, and unintended stimulation had been internally reported but not publicly disclosed; and these issues resulted in

multiple FDA recalls, including Class I recalls of Proclaim IPGs in 2023 and Class II recalls in 2024, which mirror the adverse experiences of Plaintiffs and other patients. Abbott also initiated a Class II recall of the Eterna IPG, Model 32400, in October 2025, for loss of communication with the clinician programmer and patient controller. Abbott's representative continued to reprogram Plaintiff Bartlett's Eterna device after that recall without disclosing it to her.

212. Abbott's concealment was carried out through specific statements and conduct of its representatives, which gave rise to a duty to disclose the full truth: (a) after telling Plaintiff Delagrange that the permanent device was the "same unit," with the "same expectations for relief," as the trial device, Abbott's representatives responded to his complaints of shocks, burning, and lack of relief assuring him that the device had been put in correctly, attributing his symptoms to swelling and irritation from the incision, and reprogramming his device approximately twelve times, as often as weekly, without disclosing known failure modes; (b) Abbott's representative Karri reprogrammed Plaintiff Bartlett's device approximately seventeen times and gave no response or explanation when Plaintiff Bartlett reported headaches, burning at the implant site, and battery overheating; (c) Abbott's representative responded to Plaintiff Saler's complaints of shocks and burning by reprogramming her device three or four times without disclosing known failure modes; (d) after telling Plaintiff Johnson that he could expect at least 50 percent pain relief, Abbott's representative Nicole reprogrammed his device at least five times between 2018 and 2021 and, when he reported severe overstimulation and that the device was not working, could not explain why, without disclosing known failure modes; and (e) after telling Plaintiff White that the permanent device would be better than the trial device, Abbott's representative responded to his complaints of shocks, lack of pain relief, and the device protruding through his skin by telling him that was "normal," without disclosing known failure modes.

213. Abbott's concealment of these material facts was intentional, or made with reckless disregard for the truth, and was undertaken to encourage widespread implantation and minimize safety concerns in order to preserve market share.

214. Plaintiffs and their physician justifiably relied on Abbott's omission of material safety information when consenting to implantation of the SCS systems. Plaintiffs were unaware—and had no way of knowing—that Abbott was concealing data and risks that materially affected the safety of these devices.

215. Abbott's fraudulent concealment directly and proximately caused the Plaintiffs' injuries, including their exposure to harmful device malfunctions, surgical intervention, and resulting physical and emotional harm. Had the concealed risks been disclosed, Plaintiffs would not have consented to implantation. The concealment of safety-related defects amounted to active fraud in the context of patient trust and medical device implantation. For the avoidance of doubt, Plaintiffs are not alleging fraud on the FDA.

## COUNT IX: VIOLATION OF CONSUMER PROTECTION LAWS

(Under Applicable State Law)

216. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

217. Abbott Laboratories, through its consumer-oriented marketing, labeling, promotional efforts, and public communications, engaged in false, misleading, and deceptive acts and practices in connection with the promotion and sale of its spinal cord stimulator systems that were implanted in Plaintiffs.

218. These acts include: falsely advertising the devices as safe, effective, and FDA-approved without disclosing that the approved form of the device was materially altered through over 230 PMA supplements; failing to disclose known malfunctions, including painful shocks, device shutdowns, and therapy loss; omitting material information regarding recalls, firmware instability, and clinical

trial limitations; and misrepresenting the scope and meaning of FDA approval to patients and providers.

219. Plaintiffs were foreseeable consumers of the device. Although they relied in part on their physician's advice, Abbott engaged in direct-to-consumer advertising and disseminated patient-facing marketing materials that contained false or misleading information.

220. Plaintiffs and their physician(s) reasonably relied on Abbott's omissions and misrepresentations when consenting to device implantation. Had the material facts been disclosed, Plaintiffs would not have proceeded with implantation.

221. As a result of Abbott's statutory violations, Plaintiffs suffered personal injury and economic loss and are entitled to recover all damages, equitable relief, and attorneys' fees available under state consumer protection laws.

## COUNT X: NEGLIGENCE PER SE – UNAUTHORIZED PRACTICE OF MEDICINE

(Under Applicable State Law)

222. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

223. California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky law prohibits the unauthorized practice of medicine by any individual or corporate entity not licensed in California, Illinois, Pennsylvania, Georgia, Alabama, or Kentucky, respectively. These prohibitions reflect a clear public policy interest in ensuring that only licensed professionals make medical decisions affecting patient care.

224. Abbott Laboratories is not licensed to practice medicine in California, Illinois, Pennsylvania, Georgia, Alabama, Kentucky, or any other state. Nevertheless, Abbott exercised functional control over the administration of

Plaintiffs' neuromodulation therapy by: actively participating in the implantation of its SCS system in Plaintiffs' bodies, intraoperatively programing that SCS system, and programming the SCS system post-operatively; pushing firmware updates and stimulation programming changes remotely after implantation; designing and controlling preset therapy "profiles" that physicians could not override without manufacturer approval; and altering battery behavior, stimulation amplitude, and system responsiveness without physician direction or real-time medical oversight.

225. These actions constitute the unauthorized practice of medicine, as they involved making decisions about the nature, extent, and delivery of Plaintiffs' therapy during and after implantation, without informed consent or involvement by a licensed provider.

226. Under California, Illinois, Pennsylvania, Georgia, Alabama, and Kentucky law, violation of a safety statute gives rise to negligence per se where the injured party is within the class the statute was intended to protect and the injury is of the type the statute was designed to prevent.

227. Plaintiffs, as patients undergoing neuromodulation therapy, are squarely within the protected class. Their injuries, caused by improper therapeutic manipulation without medical oversight, are the exact type the law is intended to prevent.

228. In the alternative, Illinois law also prohibits the unlicensed practice of medicine. See 225 ILCS 60/3, 60/49. Abbott's corporate conduct originating from its Illinois headquarters violated that statute by enabling automated therapy changes and device behavior modulation outside the physician-patient relationship.

229. As a direct and proximate result of Abbott's unauthorized and unlicensed manipulation of Plaintiffs' therapy, Plaintiffs suffered harm, including painful stimulation, surgical revision, and other physical and emotional injuries. This harm was exacerbated by Plaintiffs' loss of therapeutic control, wherein

Abbott, through remote firmware updates, preset programming, and device-level automation, functionally practiced medicine by dictating post-implant treatment decisions that should have remained within the licensed provider-patient relationship.

## PRAYER FOR RELIEF

230. **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant Abbott Laboratories as to all counts, and award the following relief:

a. Compensatory damages in an amount to be determined at trial for physical injury, pain and suffering, emotional distress, medical expenses, loss of enjoyment of life, and all other actual damages recoverable under applicable law;

b. Statutory damages and attorney’s fees and costs pursuant to any applicable consumer protection statutes;

c. Punitive or exemplary damages, as allowed by law, based on Defendant Abbott’s willful, malicious, and/or reckless disregard for the safety and rights of Plaintiffs and the public;

d. Award attorneys’ fees and costs associated with this action under applicable law;

e. Pre-judgment and post-judgment interest as provided by law;

f. The costs of this action; and

g. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 16, 2026

Respectfully submitted,

**WISNER BAUM, LLP**

*/s/ Behram V. Parekh*
Behram V. Parekh (CA Bar # 180361)
bparekh@wisnerbaum.com
11111 Santa Monica Blvd., Ste. 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Counsel for Plaintiffs*